WOOD JENKINS LLC
Mary Anne Q. Wood (3539)
Richard J. Armstrong (7461)
Brinton M. Wilkins (10713)
500 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah  84111
Telephone: (801) 366-6060

*Attorneys for Plaintiffs*

---

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| T. DORFMAN, INC., a Canadian corporation, and TERRY DORFMAN, an individual, <br><br> Plaintiff, <br><br> v. <br><br> MELALEUCA, INC., an Idaho corporation, and FRANK L. VANDERSLOOT, individually and in his official management capacity, <br><br> Defendants. | ***COMPLAINT AND JURY DEMAND*** <br><br><br> Civil No. 2:10-cv-01213-DB <br><br> Judge Dee Benson |

Plaintiffs T. Dorfman, Inc. and Terry Dorfman, by and through the undersigned counsel, hereby complain of Defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff T. Dorfman, Inc. ("TDI"), is a Canadian corporation with its headquarters in Ontario, Canada.

2.      Plaintiff Terry Dorfman is a citizen and resident of Ontario, Canada, and is the sole shareholder, officer, and director of TDI.

3.     Defendant Melaleuca, Inc. ("Melaleuca") is an Idaho corporation, with a registered corporate office at 3910 S. Yellowstone Highway, Idaho Falls, Idaho 83402.

4.     Defendant Frank L. Vandersloot ("Vandersloot") is the Chief Executive Officer of Melaleuca, Inc.  Vandersloot is a resident of Idaho.

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2).  The controversy is between a citizen of a State and citizens of a foreign state, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.     Because a substantial part of the events giving rise to this complaint occurred in Utah, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).

## GENERAL ALLEGATIONS

7.     Melaleuca is a consumer direct-marketing company, and commonly known and referred to as a multi-level marketing company.  It manufactures skin care and other health products and markets these products through a complex network of independent contractors referred to as Independent Marketing Executives ("IME").

8.     IME's open accounts for customers to buy products directly from Melaleuca and enroll other individuals as marketing executives to build sales teams to engage in similar marketing activities.

9.     An IME that sponsors a new IME into the organization has oversight over the new enrollee, by among other things, working with the enrollees in building, training, and promoting their sales teams.  Thus, active IME's can develop exponentially expanding organizations for which they have oversight.  These organizations are referred to as "downlines" and a "downline organization."

10. Each IME has the potential to create a multi-level customer base over which it has oversight. Each IME also receives a regular commission payment reflecting a certain percentage of the income derived from the sales made by other IME's in his or her downline.

11. In July 2002, TDI enrolled as an IME with Melaleuca.

12. To become an IME, an IME in good standing must sponsor the individual or entity that is seeking to become an IME. TDI's sponsor was an individual and fellow Canadian named Michael Commisso ("Commisso").

13. Ms. Dorfman is TDI's president and sole employee.

14. As an IME, TDI opened accounts for customers to buy products directly from Melaleuca and enrolled other individuals as marketing executives to build sales teams to engage in similar marketing activities underneath TDI. TDI also enrolled other individuals and entities as IME's for Melaleuca, who in turn built similar sales teams within Melaleuca.

15. Between July 2002 and mid 2009, TDI made substantial sales and generated millions of dollars of income for Melaleuca.

16. Between 2007 and June 30, 2010, TDI earned $1,014,805 from Melaleuca sales.

17. As late as 2009, Melaleuca recognized and rewarded TDI for its contributions to Melaleuca. For instance, in 2009 Melaleuca presented TDI at Melaleuca's national convention with the so-called "$2 Million Club Award." Furthermore, Vandersloot, in his capacity as Melaleuca's CEO, appointed Ms. Dorfman to Melaleuca's "President's Club." Melaleuca also rewarded TDI for its outstanding sales performance by sending Ms. Dorfman, together with other top sellers, on a Mediterranean cruise accompanied by Vandersloot.

18. As of the end of June 2010, TDI had a lucrative downline organization. This organization consisted of 123 directors or above, and 4,367 customers.

19. In approximately March 2008, Ms. Dorfman met with Ken Dunn ("Dunn") of Max International ("Max") in Toronto.

20. Max is a multi-level marketing company headquartered in Salt Lake County, Utah.

21. In March 2008, Dunn was Max's master distributor, one of the highest and most lucrative positions in a multi-level marketing business.

22. Ms. Dorfman scheduled this meeting in an effort to convince Dunn to leave Max and enroll with Melaleuca as an IME.

23. Accompanying Ms. Dorfman on this visit was Commisso, the individual that had sponsored TDI into Melaleuca.

24. Ms. Dorfman asked Commisso to join her in the belief that together they would have a better chance of convincing Dunn to join Melaleuca.

25. While Ms. Dorfman wanted to use the meeting with Dunn to try and convince him to convert to Melaleuca, Dunn wanted to convert Ms. Dorfman to Max.

26. When they met, Dunn told Ms. Dorfman that if she left Melaleuca and began to work for Max, he could guarantee her $30,000 per month. He also told her that if she worked full time for Max, she could easily make $100,000 per month.

27. Neither Ms. Dorfman nor Commisso were interested in leaving Melaleuca or joining Max, but they agreed to tour Max's headquarters in Salt Lake City.

28. In approximately April 2008, Ms. Dorfman and Commisso toured Max's headquarters in Salt Lake City, Utah.

29. Neither Ms. Dorfman nor Commisso joined Max.

30. As part of his efforts to woo Commisso and Ms. Dorfman to Max, Dunn provided complimentary Max-produced nutritional supplements to Commisso and Ms. Dorfman.

31. Ms. Dorfman gave some of these nutritional supplements to her kid sister, Barb Dorfman. Barb Dorfman was a Melaleuca customer, and had never recruited for Melaleuca. Both products included a glutathione supplement and a weight loss supplement, neither of which Melaleuca manufactures or sells.

32. Dunn informed Ms. Dorfman that if she wanted to continue to receive the Max supplements, she would need to sign up as a Max distributor.

33. Consistent with her prior determination, Ms. Dorfman did not sign up with Max.

34. When Ms. Dorfman refused to sign up with Max, Dunn asked Ms. Dorfman if she believed Barb Dorfman would sign up with Max.

35. In response, Ms. Dorfman told Dunn to call Barb to find out for himself.

36. Dunn contacted Barb and enrolled her as a distributor for Max.

37. In June 2008, Ms. Dorfman was visiting her long-time close friend, Natalie Foeller, at the Foeller's home when Dunn called Foeller. Foeller told Dunn that Ms. Dorfman was visiting, and he asked if he could come and visit them.

38. Dunn came to visit and he, Ms. Dorfman, Foeller, and Foeller's husband, Rick, went out to dinner. During that dinner, Ms. Dorfman once again unsuccessfully tried to convince Dunn to join Melaleuca.

39. In approximately June 2008, Dunn and Barb Dorfman asked Ms. Dorfman to attend a wine and cheese party at which Dunn and Barb tried to convince Ms. Dorfman to leave Melaleuca and enroll with Max. Foeller also attended this party.

40. Several weeks after the wine and cheese party, Foeller told Ms. Dorfman that she had decided to leave Melaleuca and join Max. Ms. Dorfman told Foeller that her decision to do so was a mistake.

41. After Foeller joined Max, Ms. Dorfman learned that Dunn had allowed Barb Dorfman to personally sponsor Foeller into Max. Ms. Dorfman asked Barb why Foeller had been placed in Barb's downline. Barb told Ms. Dorfman that Dunn had placed Foeller in Barb's downline because he thought doing so would entice Ms. Dorfman to join Max later on. Foeller confirmed this reasoning when confronted by Ms. Dorfman. Ms. Dorfman then told Foeller in no uncertain terms that she was not going to join Max.

42. Ms. Dorfman attended no other functions at which Dunn or any other representative of Max tried to convince her to enroll with Max.

43. Ms. Dorfman has never sold products for Max and has received no payments from Max.

44. In October 2009, Melaleuca held an Executive Leadership Council ("ELC") meeting in California.

45. The ELC consists of Melaleuca's top-selling IME's. Ms. Dorfman attended the October 2009 ELC meeting.

46. At the California ELC, Melaleuca informed TDI and all other IME's in attendance that it was concerned that many IME's had been violating Melaleuca's "Statement of Policies

and Definitions of Terms" (the "Policies").  A true and correct copy of the Policies is attached hereto as Exhibit A.

47. In particular, Melaleuca stated that it believed IME's had been violating Melaleuca's policy titled "Non-Solicitation and Conflicts of Interest" (hereafter referred to as "Policy 20").

48. Policy 20 states, among other things: "During the period that their Independent Marketing Executive Agreements are in force Marketing Executives and all members of their Immediate Household are prohibited from directly, indirectly or through a third party recruiting any Melaleuca Customers or Marketing Executives to participate in any other business venture."

49. Policy 20 also states that:  "Marketing Executives are independent contractors and may be active in other business ventures while they are Marketing Executives for Melaleuca."

50. Melaleuca told the attendees at the ELC that Melaleuca would not terminate marketing agreements with the attendees if the IME's filled out and signed a so-called "Amnesty Card."

51. At the ELC, McKay Christensen ("Christensen"), Melaleuca's President, spoke with Ms. Dorfman about the Amnesty Card, stating to her to be careful and not make any mistakes filling out the Amnesty Card.  Christensen also stated that anything written on the Amnesty Card would not jeopardize Ms. Dorfman's business in any way.

52. In response to this warning, Ms. Dorfman told Christensen that she hoped she was not making a mistake filling out the Amnesty Card.

53. The Amnesty Card stated as follows: "This document will exempt me from termination from the Policy 20 violation prior to this date that I have disclosed below.  I

understand that this document will not exempt me from any policy violation that I have not disclosed." A true and correct copy of the Amnesty Card filled out by Ms. Dorfman is attached hereto as Exhibit B.

54. The Amnesty Card then required TDI to list all "Compan[ies] (other than Melaleuca) that I represent or have represented"; and "Persons who are or may have been Melaleuca Marketing Executives or customers with whom I may have approached or discussed this other business venture". *See* Exhibit B.

55. In response to the first question listed on the Amnesty Card, Ms. Dorfman wrote: "I do not & never have represented any other company since joining Melaleuca."

56. In response to the second question, Ms. Dorfman wrote: "I asked Warren Peters to evaluate product for my sister who had joined Max Int'l. Natalie Foeller & I looked at Max together. She joined I did not." *Id*.

57. On November 11, 2009, Ms. Dorfman provided a sworn affidavit (the "November Affidavit") to Justin Powell ("Powell") and Johnny Morgison ("Morgison"). A true and correct copy of the November Affidavit is attached hereto as Exhibit C.

58. Powell is an in-house attorney for Melaleuca. Morgison is currently a management level employee at Melaleuca, and, during the relevant time period, was in charge of Melaleuca's Canadian distributors.

59. In the November Affidavit, Ms. Dorfman stated as follows:

> Michael Commisso and I met with Ken Dunn of Max International. At this meeting he told us that if we were to join his company he would guarantee our income and would put us in a good position in the binary. He felt that we could easily make $100,000 per month in the first year. Neither of us took him upon his offer. I did meet

> with Ken Dunn again, and at this time he told me that if I were to join Max and work it full time he would guarantee me $30,000 per month.  He said if I joined and only worked it part time he would honor that guarantee if I got terminated from Melaleuca.  Once again I declined.  I was not and I'm still not interested in joining any other companies.
>
> After talking with Ryan [Nelson] the other day, I got a call from Ken Dunn wanting to know what Michael and I had said to Melaleuca.  I never called him back.

*See* Ex. C.

60. On or about July 19, 2010, Ms. Dorfman received a telephone call from Christensen, Jerry Felton ("Felton"), and Ryan Nelson ("Nelson").  Felton was Melaleuca's Senior Vice President of Sales, and Nelson was another in-house attorney at Melaleuca.

61. During this telephone call, Ms. Dorfman was informed that Melaleuca had stopped payment on TDI's June 2010 commission check.  This check was for $33,774.44.

62. Melaleuca told Ms. Dorfman that it had stopped payment on the commission check in light of some questions that had developed in connection with a separate lawsuit between Melaleuca and Max.

63. During this phone call, Ms. Dorfman tried to ask questions to clarify why the commission check had been stopped.  Nelson told Ms. Dorfman that no one would answer any of her questions at that point.  Nelson also told Ms. Dorfman that they would be in contact with her in the future for further questioning.

64. On July 21, 2010, Nelson and Felton called Ms. Dorfman and demanded she fly to Idaho Falls, Idaho, for a meeting on July 27, 2010.  Ms. Dorfman agreed to attend the scheduled meeting.

65.     During this phone call, Nelson demanded that Ms. Dorfman bring to the meeting photo copies of all of her personal and business telephone bills from January 2008 through December 2009.  Ms. Dorfman complied with this demand and brought the records to the July 27 meeting.

66.     On July 27, Ms. Dorfman was interrogated by Christensen, Felton and Nelson beginning at 9:30 a.m. at Melaleuca's headquarters in Idaho Falls.  Excluding a break for lunch, the interrogation of Ms. Dorfman proceeded until approximately 3:00 p.m.

67.     Before the interrogation started, Ms. Dorfman was informed that the interrogation would be audio taped and that she would be able to receive copies of the audio tapes.

68.     During the interrogation, Ms. Dorfman was asked about her involvement with Max.  In response, Ms. Dorfman reiterated: (1) her visit with Dunn and Commisso in Toronto; (2) her visit to Salt Lake City with Commisso; (3) her discussion with Dunn regarding not wanting to continue to receive Max products and her suggestion that Dunn call Barb Dorfman himself; (4) her dinner with Dunn and the Foellers; (5) the wine and cheese party she attended at which Dunn tried to convince her to join Max; and (6) Foeller's eventual decision to leave Melaleuca and join Max.

69.     Ms. Dorfman told Christensen, Felton, and Nelson that she had not attended any other meetings with representatives of Max and that she had never joined Max or been paid any money by Max.

70.     After the interrogation, Ms. Dorfman left Melaleuca's headquarters.  Shortly after leaving, she received a phone call demanding she return to headquarters to meet with Vandersloot.

71.     Ms. Dorfman returned and met with Vandersloot and Nelson for continued interrogation. This second round of interrogation was audio-taped.

72.     Vandersloot told Ms. Dorfman that Christensen had told him that when Ms. Dorfman filled out the Amnesty Card at the California ELC, she had said she hoped she was not making a mistake *staying* with Melaleuca. Ms. Dorfman corrected Vandersloot and told him that she had said she hoped she did not make a mistake in filling out her Amnesty Card.

73.     Vandersloot accused Ms. Dorfman of being more loyal to her friends than to Melaleuca. Ms. Dorfman informed Vandersloot that she was loyal to Melaleuca and had worked to develop her business day and night at the expense of her personal life.

74.     Vandersloot accused Ms. Dorfman of not being fully forthright in reporting individuals that she knew were involved with Max.

75.     Vandersloot told Ms. Dorfman that he would spend every cent he had crushing Max.

76.     After this second round of interrogation, Nelson demanded Ms. Dorfman fax copies of her personal and business bank statements to him. Ms. Dorfman did so.

77.     On Friday, August 6, 2010, Ms. Dorfman received a telephone call from Christensen and Nelson telling her that Melaleuca was terminating TDI for violations of Policy 20. During this phone call, Christensen and Nelson demanded that Ms. Dorfman pay back all money she had earned from Melaleuca since May 2008 – an amount totaling $677,177.26.

78.     Six days later, on Thursday, August 12, 2010, Melaleuca began its annual convention in Salt Lake City, Utah.

79. On that date, Melaleuca held a meeting for its executives and senior directors at the Salt Lake Convention Center. This meeting was attended by approximately 1,500 people. Ms. Dorfman did not attend the meeting.

80. Among those in attendance were close and personal friends and business associates of Ms. Dorfman, including numerous business associates that Ms. Dorfman had mentored in Melaleuca.

81. The so-called "executives" and "senior directors" are leaders in Melaleuca, and are well-known in the Melaleuca distributor network as being top income earners.

82. At the meeting for executives and senior directors, Vandersloot told the attendees that Max was stealing Melaleuca's IMEs, and that Ms. Dorfman was intimately involved in Max's efforts to steal Melaleuca's IME's. Vandersloot also told all attendees that Ms. Dorfman had violated her contractual obligations to Melaleuca by violating Policy 20, that she had lied to Melaleuca to cover it up, and that Melaleuca had terminated Ms. Dorfman as a result.

83. Vandersloot threatened all in attendance that Melaleuca was obtaining subpoenas of telephone records of numerous former marketing executives, and that Melaleuca would find out who was talking to distributors at Max and sue them as a result.

84. Vandersloot provided the attendees with details about Ms. Dorfman's alleged contract violations by announcing that Ms. Dorfman had arranged a meeting for her kid sister, Barb Dorfman, with Max, and that Ms. Dorfman was responsible for Barb Dorfman becoming a distributor at Max.

85. Vandersloot also announced that Ms. Dorfman had made in excess of $600,000.00 from Melaleuca during the time she was purportedly violating her contract with Melaleuca, and that Melaleuca was going to sue her to get it back.

86. Vandersloot also warned the attendees that if they talked with Ms. Dorfman at all, they would be sued by Melaleuca.

87. The defamatory statements were made solely for the purpose to threaten and instill fear in the minds of the attendees that regardless of income levels, Melaleuca would terminate and sue any marketing executive if there is any suspicion of a marketing executive violating the company's so-called Policy 20.

88. After Vandersloot spoke about Ms. Dorfman, Nelson told the attendees that "crying" would not help anyone avoid being terminated, implying that the termination of Ms. Dorfman was an emotional disturbance and occurrence for Ms. Dorfman.

89. On August 18, 2010, Ms. Dorfman called Christensen and asked for copies of the audio tapes of the July 27 interrogations. Christensen said that it would not be a problem giving her a copy of the tapes. Ms. Dorfman also asked Christensen to detail for her all of her alleged violations of Policy 20. Christensen said he would talk to Nelson regarding her request and get back to her.

90. Also on August 18, Christensen told Ms. Dorfman that Melaleuca cared about her and would let her come back and start again as a marketing executive and that Melaleuca would help her in doing so, but would not allow her to start with her established downline organization.

91. On August 19, Nelson called Ms. Dorfman and told her she could not have a copy of the audio tapes.

92. Nelson also told Ms. Dorfman that if she would give Melaleuca some names of marketing executives who were violating Policy 20, Melaleuca would make a deal with her about the money she would be required to pay back.  Nelson also stated that if Ms. Dorfman ever wanted to come back and start over again from scratch as a marketing executive, Melaleuca would love to have her do so.

93. Nelson also told Ms. Dorfman that she was terminated for the following reasons: (1) enticing Commisso to visit Max; (2) giving her sister's telephone number to Dunn; (3) attending the wine and cheese party and not reporting to Melaleuca the attendance of Foeller, Gary Harris, and Kathy Harris, all of whom were Melaleuca IME's; and (4) when asked to do so by her sister, typing up a list of people who were going to attend a Max event when the list included Foeller and the Harrises.

94. Melaleuca has filed numerous lawsuits in Idaho against its former marketing executives that are alleged to have left Melaleuca to work as distributors for Max, and are alleged to have violated Policy 20.  These former IME's include the Foellers, Laraine and Raymond Agren from Hawaii, and Gwendolyn and Ledell Miles from Georgia.

95. Melaleuca has not filed any such lawsuit against Ms. Dorfman.

**FIRST CAUSE OF ACTION**
**(Breach of Contract Against Melaleuca)**

96. Plaintiffs incorporate all prior paragraphs as if set forth fully.

97. Melaleuca entered into a contractual relationship with TDI when it distributed and Ms. Dorfman signed the Amnesty Card at the California ELC.

98. Melaleuca contracted to not terminate TDI for previous violations of Policy 20 if TDI listed all "Compan[ies] (other than Melaleuca) that I represent or have represented", together with "Persons who are or may have been Melaleuca Marketing Executives or customers with whom I may have approached or discussed this other business venture."

99. TDI did not have any pre-existing duty or obligation to fill out and sign the Amnesty Card.

100. TDI provided all the requested information and complied with its duties under the contract.

101. Melaleuca has breached its contractual agreement by terminating TDI despite TDI's compliance with the contractual terms.

102. TDI has lost its distributorship at Melaleuca as a result of Melaleuca's breach. The value of this distributorship is estimated to be approximately $5.1 million.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against Melaleuca)

103. Plaintiffs incorporate all prior paragraphs as if set forth fully.

104. Every contract contains an implied covenant of good faith and fair dealing that the parties will do nothing to deprive each other of the reasonably anticipated benefits of the contract.

105. The duty not to act in bad faith or deal unfairly thus becomes a part of the contract, and, as with any other element of the contract, the remedy for its breach generally is on the contract itself.

106. By terminating TDI despite TDI's compliance with the contractual terms of the Amnesty Card, Melaleuca has breached the covenant of good faith and fair dealing.

107. TDI has been damaged in an amount to be proven at trial but not less than $5.1 million.

## THIRD CAUSE OF ACTION
### (Defamation/Slander Against Vandersloot and Melaleuca)

108. Plaintiffs incorporate all prior paragraphs as if set forth fully.

109. Vandersloot and Melaleuca made false statements regarding Ms. Dorfman at the annual convention. Specifically, Vandersloot and Melaleuca falsely stated that Ms. Dorfman had violated Policy 20; that she was intimately involved in Max's efforts to steal Melaleuca's IME's; that she had otherwise violated her contract with Melaleuca; and that she had lied to Melaleuca to cover it up.

110. Those in attendance included close and personal friends and business associates of Ms. Dorfman.

111. Vandersloot and Melaleuca intended these statements to scare those in attendance, stating that no one in the meeting was to speak with Ms. Dorfman, otherwise they would be sued by Melaleuca.

112. Vandersloot and Melaleuca published these false statements to all attendees of the executive and senior director meeting at Melaleuca's annual convention.

113. Vandersloot's and Melaleuca's statements were defamatory in that they injured Ms. Dorfman's reputation with at least the attendees at the executive and senior director meeting.

114. Vandersloot acted at least recklessly, if not with malice, in making the false statements. Vandersloot made the statements after he and other representatives at Melaleuca had met with Ms. Dorfman, during which meetings Ms. Dorfman had clarified that she had not violated Policy 20, that she was not involved in Max's alleged efforts to take Melaleuca's IME's, and that she had not arranged a meeting for her sister with Max.

115. Defendants' defamatory statements were not subject to any privilege.

116. As a result of these statements and their publication to those in attendance at the convention, Ms. Dorfman has suffered significant emotional distress and other actual damage in an amount to be proven at trial.

117. Vandersloot's and Melaleuca's conduct constitutes malicious and reckless conduct, such that Ms. Dorfman is entitled to an award of punitive damages in an amount to be proven at trial, but not less than $5 million.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Existing Business Relations Against Melaleuca)

118. Plaintiffs incorporate all prior paragraphs as if set forth fully.

119. TDI had valid and existing contractual business relations with all other IME's and customers in its downline.

120. Melaleuca knew of these relationships by virtue of the nature of Melaleuca's business model.

121. Melaleuca therefore knew of the numerous existing business relationships that TDI had established over the years with its customers and downline IME's.

122. Melaleuca knowingly engaged in intentional acts intended and designed to disrupt the business relationships between TDI and all of its clients and downline IME's.

123. Melaleuca has, through improper means and for an improper purpose, intentionally interfered with TDI's contractual relationships and business relations with TDI's customers/clients and downline IME's.

124. Melaleuca's interference with TDI's business relationships actually interfered with and disrupted business relations with all of its customers and downline IME's.

125. As a direct and proximate result of Melaleuca's interference with TDI's business relationships, TDI has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Interference with Prospective Business Relations Against Melaleuca)

126. Plaintiffs incorporate all prior paragraphs as if set forth fully.

127. TDI was actively involved in locating, developing, and creating new IME's and customers.

128. Melaleuca knew that TDI was active and highly motivated to market and purchase Melaleuca products, and to further grow and develop her downline organization.

129. Based on TDI's years of lucrative sales production for Melaleuca, Melaleuca therefore knew that TDI was actively working to develop prospective business relations.

130. Melaleuca knowingly engaged in intentional acts intended and designed to disrupt TDI's prospective business relationships.

131.    Melaleuca has, through improper means and/or for an improper purpose, intentionally interfered with TDI's prospective contractual relationships and business relations with potential customers and IME's.

132.    Melaleuca's interference with TDI's prospective business relationships actually interfered with and disrupted business relations with prospective customers and new IME's.

133.    As a direct and proximate result of Melaleuca's interference with TDI's prospective business relationships, TDI has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Judgment against Melaleuca for contract, compensatory, and consequential damages, including but not limited to, special damages, in an amount totaling not less than $5.1 million;

B.    Judgment against Vandersloot and Melaleuca for compensatory, consequential, and punitive damages, including but not limited to, special damages, in an amount to be proven at trial;

C.    For such other and further relief as may be just and proper.

DATED this 7th day of December, 2010.

WOOD JENKINS LLC


/s/ Richard J. Armstrong
Mary Anne Q. Wood
Richard J. Armstrong
Brinton M. Wilkins
*Attorneys for Plaintiffs*

S:\WPDATA\PLEADING\DORFMAN.MELALEUCA.COMPLAINT.wpd